**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 25-140

Caption [use short title]

Motion for: Leave of Christian Legal Society and InterVarsity Christian Fellowship/USA to File a Brief Amicus Curiae in Support of Plaintiff-Appellants and Reversal

University at Buffalo Young Americans for Freedom

Set forth below precise, complete statement of relief sought:

Christian Legal Society and InterVarsity respectfully move the Court for leave to file an amicus brief in support of Plaintiffs-Appellants University at Buffalo Young Americans for Freedom.

v.

University at Buffalo Student Association Inc.

MOVING PARTY: Christian Legal Society & InterVarsity    OPPOSING PARTY: University at Buffalo Student Association, Inc.

☐ Plaintiff    ☐ Defendant
☐ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: Kimberlee W. Colby    OPPOSING ATTORNEY: Aaron Saykin

[name of attorney, with firm, address, phone number and e-mail]

CHRISTIAN LEGAL SOCIETY CENTER FOR LAW & RELIGIOUS FREEDOM    Hodgson Russ

8001 Braddock Rd., Suite 302    140 Pearl Street, Suite 100, Buffalo, NY 14202

Springfield, VA 22151  kcolby@clsnet.org    asaykin@hodgsonruss.com

Court- Judge/ Agency appealed from: U.S. District Court for the Western District of NY

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☒ Yes  ☐ No (explain):_____

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below?    ☐Yes ☐No
Has this relief been previously sought in this court?    ☐Yes ☐No

Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:
☐ Unopposed ☒ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☒ Yes ☐ No ☐ Don't Know

Is the oral argument on motion requested?  ☐ Yes ☒ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?  ☐ Yes ☒ No  If yes, enter date:_____

Signature of Moving Attorney:

_Kimberlee W. Colby_  Date: March 18, 2025    Service : ☒ Electronic ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# 25-140

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

UNIVERSITY AT BUFFALO YOUNG AMERICANS FOR FREEDOM,
JUSTIN HILL, AND AMELIA SLUSARZ,

*Plaintiffs-Appellants*,

v.

UNIVERSITY AT BUFFALO STUDENT ASSOCIATION, INC., BRIAN HAMLUCK in his
official capacity as the University at Buffalo Vice President for Student Life,
TOMÁS AGUIRRE in his official capacity as the University at Buffalo Interim Dean
of Students, and PHYLLIS FLORO in her official capacity as the University at
Buffalo Director of Student Engagement,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Case No. 1:23-cv-00480

## MOTION FOR LEAVE OF CHRISTIAN LEGAL SOCIETY
## AND INTERVARSITY CHRISTIAN FELLOWSHIP/USA
## TO FILE A BRIEF *AMICI CURIAE* IN SUPPORT
## OF PLAINTIFFS-APPELLANTS AND REVERSAL

Kimberlee W. Colby
*Counsel of Record*
Christian Legal Society
Center for Law & Religious Freedom
8001 Braddock Road, Suite 302
Springfield, VA 22151
(703) 919-8556
kcolby@clsnet.org

*Attorney for Amici Curiae*

## DISCLOSURE STATEMENT

Christian Legal Society and InterVarsity Christian Fellowship/USA have no parent corporations and no stockholders.[1]

## INTRODUCTION AND DISCLOSURE OF PARTIES' POSITIONS

Pursuant to Federal Rule of Appellate Procedure 27 and Local Rule 27.1, proposed *Amici Curiae* Christian Legal Society ("CLS") and InterVarsity Christian Fellowship/USA ("InterVarsity") respectfully move for leave to file the accompanying Brief *Amici Curiae* of Christian Legal Society and InterVarsity Christian Fellowship/USA in Support of Plaintiffs-Appellants and Reversal.

Counsel for CLS and InterVarsity notified opposing counsel for all parties, asking their consent to file the accompanying brief. Consent to file the accompanying brief in this case was given by counsel for Defendants-Appellees Brian Hamluck, Tomás Aguirre, and Phyllis Floro and by counsel for Plaintiffs-Appellants. Counsel for Defendant-Appellee University at Buffalo Student Association, Inc. did not consent to the filing of the accompanying brief. Counsel for Defendants-Appellees Brian Hamluck, Tomàs Aguirre, and Phyllis Floro, and Counsel for Appellants do not intend to file a response to this motion. Counsel for

---

[1] No party or party's counsel authored this motion in whole or in part, and no person—other than amici curiae, their members, or their counsel—contributed money intended to fund the motion's preparation or submission.

1

Defendant-Appellee University at Buffalo Student Association, Inc. has indicated he does intend to file a response to this motion.

## IDENTITY AND INTEREST OF PROPOSED *AMICI CURIAE*

**Christian Legal Society**: Founded in 1961, Christian Legal Society ("CLS") is an association of Christian attorneys, law students, and law professors. CLS believes that pluralism, essential to a free society, prospers only when the First Amendment rights of all Americans are protected regardless of the current popularity of their speech. CLS was instrumental in passage of the Equal Access Act of 1984, 20 U.S.C. §§ 4071-4074, which protects the right of all students to meet for "religious, political, philosophical or other" speech on public secondary school campuses. 128 Cong. Rec. 11784-85 (1982) (Sen. Hatfield statement).

CLS has law student chapters at approximately 135 law school campuses, including in New York and Connecticut. In some years, CLS has had a student chapter at the University at Buffalo. These chapters typically are small groups of students who meet for prayer, Bible study, and worship. These student organizations frequently bring in outside speakers to address legal issues from a religious perspective. The speakers are knowledgeable, highly reputable attorneys who address various aspects of faith and law. On occasion, a CLS chapter will bring in an outside speaker whose work includes defending religious freedom. CLS chapters wish to avoid controversy. But because religious freedom itself has become

2

controversial, CLS chapters sometimes experience opposition from their peers or campus administrators for bringing in a speaker with a perspective on current federal cases that is a minority viewpoint on their campuses.

In 1975, CLS established its Center for Law & Religious Freedom ("Center") to protect the First Amendment right of religious student organizations to meet on public campuses. The Center was founded in response to a new trend of religious student organizations being excluded from campus by administrators who feared that providing equal access to religious student groups somehow violated the Establishment Clause of the First Amendment. In 1981, the United States Supreme Court held that universities did not violate the Establishment Clause when they gave equal access to religious student groups. Instead, equal access for religious student groups was required by the First Amendment's protection of students' free speech and expressive association. *Widmar v. Vincent*, 454 U.S. 263 (1981). Because religious student groups continue to experience difficulties in obtaining equal access to public university campuses, the Center has worked for 50 years to secure their access to campuses nationwide.

**InterVarsity Christian Fellowship/USA**: InterVarsity Christian Fellowship/USA is a Christian ministry serving over 1,200 student and faculty chapters on over 750 university campuses across the country. It has a particular interest in this case because its chapters regularly bring in outside speakers to address

religious faith. InterVarsity has chapters on university and college campuses in New York, Vermont, and Connecticut, including at the University at Buffalo.

## GROUNDS FOR GRANTING THE MOTION

Christian Legal Society and InterVarsity Christian Fellowship/USA seek leave to file an amici curiae brief because CLS and InterVarsity believe that the First Amendment rights of all persons are to be protected regardless of the current popularity of their speech. They also believe that discrimination against speech based on viewpoint violates the Free Speech Clause of the First Amendment.

CLS and InterVarsity believe this Court would benefit from their perspective related to the First Amendment rights of free speech and expressive association of public university students. CLS and InterVarsity chapters often bring outside speakers to their campuses to expose any interested students who choose to attend their events to diverse perspectives on various topics of interest to students. It is important for ideological diversity on campus that student organizations have the ability to bring speakers to campus without fear of retaliation if a speaker's viewpoints are unpopular with some students, a student government, or administrators.

Specifically, CLS's and InterVarsity's brief addresses how the University at Buffalo Student Association and University administrators have burdened Plaintiff-Appellants' free speech by engaging in unconstitutional viewpoint discrimination.

4

The brief explains the ways in which the district court's decision relied too heavily on *Christian Legal Soc'y Chapter of the Univ. of California v. Martinez*, 561 U.S. 661 (2010). The brief explains how the *Martinez* majority and its concurrences stressed it was a very narrow decision limited to its unique factual context. The brief surveys how several federal courts of appeals have taken the majority at its word in repeatedly distinguishing *Martinez* to protect student organizations' constitutional rights.

Because CLS and InterVarsity have been directly involved in several of the cases discussed in the brief, they bring distinctive insights into how *Martinez* and the recent federal appellate cases may bear on the case before this Court. Center staff were co-counsel in *Martinez* in which a CLS student chapter was the lead party. Center staff were also co-counsel representing a religious student group and its leaders in the 2023 decision by the Ninth Circuit, sitting en banc, in *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Ed.*, 82 F.4th 664 (9th Cir. 2023) (en banc). That case is discussed in the brief because it decided several issues directly comparable to issues arising in the case before this Court.

The Center has represented the lead party in numerous cases involving equal access for religious groups to public university campuses in addition to *Martinez* and *Fellowship of Christian Athletes*. Those cases include *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) (first case heard by Supreme Court on high school

5

students' free speech right to meet for religious speech on campus); *Garnett v. Renton Sch. Dist.*, 874 F.2d 608 (9th Cir. 1989), *gvr'd,* 496 U.S. 914 (1990), *on remand*, 987 F.2d 641 (9th Cir. 1993) (defending constitutionality of Equal Access Act); *Child Evangelism Fellowship of Maryland v. Montgomery Cnty. Public Sch.*, 457 F.3d 376 (4th Cir. 2006) (religious community group has free speech right to distribute informational fliers like other community groups) and 373 F.3d 589 (4th Cir. 2004) (equal access for religious community group does not violate Establishment Clause); *Child Evangelism Fellowship of New Jersey v. Stafford Township Sch. Dist.,* 386 F.3d 514 (3d Cir. 2004) (religious community group has free speech right to distribute information fliers like other community groups); *Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) (First Amendment protects religious student group's religious leadership requirements).

CLS' Center has represented or been *amicus curiae* in dozens of cases involving equal access to campus. A small sampling of those cases include *Widmar v. Vincent*, 454 U.S. 263 (1981) (equal access for religious student group on university campus); *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995) (equal access to student activity fee funding for religious student publication); *Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001) (equal access for religious community group to elementary school classrooms after school);

*Hsu v. Roslyn Union Free Sch. Dist.*, 85 F.3d 839 (2nd Cir. 1996) (religious student group's religious leadership requirement protected).

InterVarsity Christian Fellowship/USA has been the successful lead party in two recent cases brought after InterVarsity student chapters were derecognized at the University of Iowa and Wayne State University because InterVarsity requires its leaders to agree with its religious beliefs. *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 4th 855 (8th Cir. 2021); *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp.3d 785 (W.D. Mich. 2021). CLS's Center filed amicus curiae briefs in both cases.

CLS student chapters and InterVarsity student chapters in New York, Vermont, and Connecticut, as well as their chapters nationwide, are likely to be affected by this Court's decision in this case. Their chapters play a critical role in creating and maintaining genuine diversity on university campuses. Students' free speech right "to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life" must be preserved. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 233 (2000).

## **RELIEF SOUGHT**

For the foregoing reasons, CLS and InterVarsity Christian Fellowship/USA respectfully request this Court to grant leave to file the accompanying Brief *Amici*

*Curiae* of Christian Legal Society and InterVarsity Christian Fellowship/USA in Support of Plaintiffs-Appellants and Reversal in this case.

March 18, 2025                                          Respectfully submitted,

*/s/ Kimberlee W. Colby*
Kimberlee W. Colby
   *Counsel of Record*
Christian Legal Society
Center for Law & Religious
   Freedom
8001 Braddock Road, Suite 302
Springfield, VA 22151
(703) 919-8556
kcolby@clsnet.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the length limits permitted by Second Circuit Rules. The motion is 1,519 words, excluding the portions exempted by Fed. R. App. P. 32(f). The type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

March 18, 2025

*/s/ Kimberlee W. Colby*
Kimberlee W. Colby

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2025 I electronically filed the foregoing Motion for Leave of Christian Legal Society and InterVarsity Christian Fellowship/USA to File a Brief *Amici Curiae* in Support of Plaintiff-Appellants and Reversal with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Kimberlee W. Colby*
Kimberlee W. Colby

*Counsel for Amicus Curiae*

# 25-140

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

UNIVERSITY AT BUFFALO YOUNG AMERICANS FOR FREEDOM,
JUSTIN HILL, AND AMELIA SLUSARZ,

*Plaintiffs-Appellants*,

v.

UNIVERSITY AT BUFFALO STUDENT ASSOCIATION, INC., BRIAN HAMLUCK in his
official capacity as the University at Buffalo Vice President for Student Life,
TOMÁS AGUIRRE in his official capacity as the University at Buffalo Interim
Dean of Students, and PHYLLIS FLORO in her official capacity as the
University at Buffalo Director of Student Engagement,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Case No. 1:23-cv-00480

## BRIEF *AMICI CURIAE* OF CHRISTIAN LEGAL SOCIETY
## AND INTERVARSITY CHRISTIAN FELLOWSHIP/USA
## IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Kimberlee W. Colby
*Counsel of Record*
Christian Legal Society
Center for Law & Religious
   Freedom
8001 Braddock Road, Suite 302
Springfield, VA 22151
(703) 919-8556
kcolby@clsnet.org
*Attorney for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Christian Legal Society and InterVarsity Christian Fellowship/USA have no parent corporations, do not have shareholders, and do not issue stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES ..................................................... v

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................. 1

SUMMARY OF ARGUMENT .................................................. 2

ARGUMENT ............................................................... 5

I.   Because of the Novel Policy at Issue and Specific
     Factual Stipulation, *Martinez*'s Scope Is Narrow
     and Limited to its Unique Factual Context. ...................... 5

     A. The majority opinion and two concurrences
        emphasize *Martinez*'s narrowness. ............................ 5

     B. The *Martinez* majority relied on a unique
        factual stipulation. ......................................... 8

     C. Under *Martinez*, a facially viewpoint neutral
        policy may still be viewpoint discriminatory
        if it is selectively enforced or is a façade or
        pretext for viewpoint discrimination. ........................ 9

     D. Correctly addressing the limits of the *Martinez*
        decision, several federal courts of appeals have
        protected student organizations' First Amendment
        rights. ...................................................... 13

          1. The Ninth Circuit, sitting en banc, acknowledged
             *Martinez*'s limited scope in finding that education
             officials had unconstitutionally denied recognition
             to a religious student organization because of its
             religious leadership requirements. ...................... 13

a. *Martinez* did not render the school district's all-comers policy constitutional. ........................................ 14

b. The en banc Ninth Circuit overruled a 2011 decision that had extended *Martinez*'s applicability. .................................................. 18

2. The Eighth Circuit denied qualified immunity to university officials who revoked student organizations' recognition. ........................ 19

3. The Seventh Circuit recognized *Martinez*'s limited scope in the context of access to student activity fees. ............................................. 22

II. Because of its Unique Factual Context, *Martinez* Does Not Support Application of the Student Association's National Affiliation Ban, Legal Status Ban, or Acknowledgment Form to YAF. ............................ 23

A. The facts of this case differ significantly from *Martinez*. .................................................. 23

B. The policies at issue here differ significantly from the *Martinez* policy. ........................................... 27

III. In Their Treatment of YAF, the University and Student Association Have Failed to Obey "the Rule of Viewpoint Neutrality." ................................. 30

A. The Student Association's control over YAF's ability to take legal action prevents effective judicial review, which is a vital protection against viewpoint discrimination and unbridled discretion. ................................................ 31

B. The Student Association violated viewpoint neutrality by imposing its majoritarian determination on YAF. ............................................................... 34

C. Post-hoc justifications violate viewpoint neutrality ..................... 36

CONCLUSION ........................................................................... 38

CERTIFICATE OF COMPLIANCE ........................................ 39

CERTIFICATE OF SERVICE ................................................ 40

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpha Delta Chi-Delta Chapter v. Reed,*
    648 F.3d 790 (9th Cir. 2011) ....................................................... 18, 19

*Amidon v. Student Ass'n of State Univ. of*
    *New York at Albany,*
    508 F.3d 94 (2d Cir. 2007) ....................................... 3, 24, 30-32, 34, 35

*Badger Cath., Inc. v. Walsh,*
    620 F.3d 775 (7th Cir. 2010) ............................................................. 22

*Bd. of Regents of Univ. of Wisconsin Sys. v.*
    *Southworth,*
    529 U.S. 217 (2000) .................................................. 3, 22-24, 30, 32-34

*Business Leaders in Christ v. Univ. of Iowa,*
    991 F.3d 969 (8th Cir. 2018) ........................................................ 19-21

*Business Leaders in Christ v. Univ. of Iowa,*
    360 F. Supp.3d 885 (S.D. Iowa 2019) .......................................... 19, 20

*Christian Legal Soc'y Chapter of the*
    *Univ. of California v. Martinez,*
    561 U.S. 661 (2010) ............................... 2, 3, 5-16, 18, 20-23, 27-30, 33

*Employment Div. v. Smith,*
    494 U.S. 872 (1990) .......................................................................... 16

*Fellowship of Christian Athletes v. San Jose*
    *Unified Sch. Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023) (en banc) ........... 13-19, 23, 29, 30, 36, 37

*Fellowship of Christian Athletes v. San Jose*
   *Unified Sch. Dist. Bd. of Educ.*,
   2022 WL 1786574 (N.D. Cal. 2022) ..................................... 14

*Field Day, LLC. v. Cnty. of Suffolk*,
   463 F.3d 167 (2d Cir. 2006) ............................................... 31

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ................................................... 16, 19

*Healy v. James*,
   408 U.S. 169 (1972) ............................................. 10, 20, 33

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
   5 F.4th 855 (8th Cir. 2021) ........................................ 19, 21

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
   408 F. Supp.3d 960 (S.D. Iowa 2019) ................................. 21

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ....................................................... 37

*Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*,
   584 U.S. 617 (2018) ................................................... 17, 19

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ....................................................... 18

*Rosenberger v. Rector and Visitors of*
   *Univ. of Virginia*,
   515 U.S. 828 (1995) ......................................... 20, 22-24, 33

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ..................................................... 16, 19

*Thomas v. Chicago Park Dist.*,
   534 U.S. 316 (2002) ....................................................... 31

*United States v. Virginia*,
  518 U.S. 515 (1996) .......................................................................... 37

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ............................................................ 20, 22, 33

**Statutes and Regulations**

20 U.S.C. § 1681(a)(6)(A) .................................................................. 12

20 U.S.C. §§ 4071-4074 ....................................................................... 1

**Other Authorities**

128 Cong. Rec. 11784-85 (1982) ........................................................ 1

John Inazu, *Justice Ginsberg and Religious Liberty*,
  63 Hastings L.J. 1213 (2012) ......................................................... 12

Michael McConnell, *Freedom of Association: Campus
  Religious Groups*,
  97 Wash. U. L. Rev. 1641 (2000) .................................................... 12

Michael Stokes Paulsen, *Disaster: The Worst Religious
  Freedom Case in Fifty Years*,
  24 Regent U. L. Rev. 283 (2012) .................................................... 12

Peter Schmidt, *Ruling is Unlikely to End Litigation
  Over Policies on Student Groups*,
  Chron. Higher Educ. (June 30, 2010),
  http://chronical.com/article/Many-Colleges-Student-
  Group/66101 ................................................................................ 12

University of Buffalo Student Guide: Fraternities
  and Sororities,
  https://www.buffalo.edu/student life/life-on-campus/
  clubs-and-activities/search/fraternity-and-sorority-
  life.html ...................................................................................... 11

vii

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Christian Legal Society ("CLS") is an association of Christian attorneys, law students, and law professors with student chapters at approximately 135 law schools, including law schools in New York and Connecticut. CLS law student chapters typically are small groups of students who meet for prayer, Bible study, and worship. CLS has a particular interest in this case because its chapters frequently bring outside speakers to campus to address legal issues from a religious perspective. CLS believes that pluralism, essential to a free society, prospers only when the First Amendment rights of all Americans are protected regardless of the current popularity of their speech. CLS was instrumental in passage of the Equal Access Act of 1984, 20 U.S.C. §§ 4071-4074, that protects the right of all students to meet for "religious, political, philosophical or other" speech on public secondary school campuses. 128 Cong. Rec. 11784-85 (1982) (Sen. Hatfield statement).

---

[1] No party or party's counsel authored this brief in whole or in part, and no person—other than amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

1

InterVarsity Christian Fellowship/USA is a Christian ministry serving over 1,200 student and faculty chapters on over 750 university campuses across the country, including in Vermont, Connecticut, and New York, specifically at the University at Buffalo. It has a particular interest in this case because its chapters regularly bring in outside speakers to address religious faith.

A motion for leave to file accompanies this brief. Counsel for Plaintiffs-Appellants and for Appellees Hamluck, Tomàs, and Floro gave consent to file, but counsel for Appellee Student Association denied consent.

## SUMMARY OF ARGUMENT

In upholding the University's and its Student Association's unconstitutional treatment of Young Americans for Freedom ("YAF"), the court below relied too heavily on *Christian Legal Soc'y Chapter of the Univ. of California v. Martinez*, 561 U.S. 661 (2010). Certainly, *Martinez* is one of several Supreme Court cases dealing with student organizations' access to a university's student organization forum with its accompanying benefits of recognition. But the *Martinez* majority and its concurrences stressed it was a very limited decision. *Infra*, pp. 5-13.

2

And the federal courts of appeals have taken the majority at its word in repeatedly distinguishing *Martinez* to protect student organizations' constitutional rights. *Infra*, pp. 13-22.

In doing so, these appellate courts have recognized the critical role that unpopular student organizations necessarily play in creating and maintaining genuine ideological diversity on university campuses. A university's "mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall." *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 233 (2000). To preserve diversity on campus, "[a]ccess to a [student organization] forum . . . does not depend upon majoritarian consent." *Id.* at 235. Instead, "[t]he whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Id.; accord Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 100 (2d Cir. 2007).

Unfortunately, when universities delegate authority to student governments, such as the Student Association here, they often function in a highly ideologically oriented framework as they make

3

consequential decisions regarding access to the student organizations forum. Their decisions are often detrimental to student organizations representing ideological minorities—whether political, social, cultural, or religious. The Supreme Court and this Court have directed that courts closely examine situations in which an unpopular student organization claims not to have received straightforward, objective, and fair treatment from a student government.

In this case, a close examination is essential because the University and Student Association have deprived student organizations of a "separate legal entity" and prohibited them from "tak[ing] legal action and commenc[ing] litigation." JA 228-229. For unpopular student organizations, effective judicial review is a vital safeguard of viewpoint neutrality in the administration of a student organization forum and a crucial antidote to unbridled discretion by student government officers. *Infra*, pp. 31-34.

Separately, the facts surrounding the Student Association's adoption of the National Affiliation Ban, Acknowledgment Form, and Legal Status Ban make plain that these policies targeted YAF's disfavored speech. By imposing majoritarian determinations on YAF,

these policies violate viewpoint neutrality. *Infra*, pp. 27-28, 34-35. The Acknowledgment Form represents a stratagem that mirrors the 1950s era of loyalty oaths and was recently rejected in the context of a student organization forum by the Ninth Circuit sitting en banc. And the two policies adopted after YAF filed suit are "invented post-hoc justifications in response to litigation" and, therefore, incompatible with the First Amendment. *Infra*, pp. 36-37.

## ARGUMENT

### I. Because of the Novel Policy at Issue and Specific Factual Stipulation, *Martinez*'s Scope Is Narrow and Limited to its Unique Factual Context.

#### A. The majority opinion and two concurrences emphasize *Martinez*'s narrowness.

The Supreme Court's deeply split decision in *Christian Legal Soc'y Chapter of the Univ. of California v. Martinez*, 561 U.S. 661 (2010), was exceptionally narrow.[2] The Court held, 5-4, that the Constitution

---

[2] Justice Ginsburg wrote the majority opinion on behalf of Justices Stevens, Kennedy, Breyer, and Sotomayor. Justices Stevens and Kennedy each wrote separate concurrences. Justice Alito's dissent was joined by Chief Justice Roberts and Justices Thomas and Scalia.

permitted—but did not require—a law school to have an "all-comers" policy that required religious student groups to accept as their leaders and voting members students who did not agree with their religious beliefs, but only if the policy was applied uniformly to *all* student groups.

Writing for the majority, Justice Ginsburg emphasized that "[t]his opinion, therefore, considers *only* whether conditioning access to a student-organization forum on compliance with an *all-comers policy* violates the Constitution." *Id.* at 678 (emphasis added). Justice Ginsburg stressed that "[t]his case concerns a *novel question* regarding student activities at public universities." *Id.* at 668 (emphasis added). The specific issue was whether "a public school [may] condition its official recognition of a student group—and the attendant use of school funds and facilities—on the organization's agreement to open eligibility for membership and leadership to all students[.]" *Id.*

The majority explicitly refused to decide whether the law school could use its written *nondiscrimination* policy, which like most nondiscrimination policies enumerated categories of protected classes, to justify denying recognition to a religious student group because it

6

required its leaders and voting members to agree with its core religious beliefs. *Id.* at 678 n.10 (constitutionality of university's written nondiscrimination policy "is not properly presented"). Instead, the majority limited its decision to whether the law school could apply an uncommon "*all-comers* policy" to deny recognition to a religious student group. *Id.* at 678.

The majority believed the all-comers policy "require[d] *all* student groups to accept *all* comers." *Id.* at 694 (original emphasis). "Critical here, all RSOs must undertake to comply with" the law school's policies. *Id.* at 670; *see also id.* at 704 (Kennedy, J., concurring) ("Here, the policy applies equally to all groups and views.")

But—and this is key—despite its seeming confidence that the all-comers policy was applied uniformly to all groups, the majority nonetheless remanded the case for the lower courts to "address[] an argument that [the law school] selectively enforces its all-comers policy" or was pretextual. *Id.* at 697-98.

In separate concurrences, Justice Stevens and Justice Kennedy emphasized the decision was narrow. Justice Stevens agreed it was limited to the all-comers policy and commended the majority for

7

"correctly confin[ing] its discussion to the narrow issue presented by the record." *Id.* at 698 (Stevens, J., concurring). Justice Kennedy noted several scenarios with small factual changes that "would present a case different from the one before us." *Id.* at 706 (Kennedy, J., concurring). *Infra*, pp. 10-11.

## B. The *Martinez* majority relied on a unique factual stipulation.

The majority relied upon the parties' stipulation that the law school had an "all-comers" policy that required *all* student groups to "'allow *any* student to participate, become a member, or seek leadership positions in the organization, regardless of [her] status or beliefs.'" *Id.* at 675 (quoting Joint Stipulation ¶18) (original emphasis and brackets). Every group must accept as a leader any student, whether or not the student agreed with—or actively opposed—the beliefs by which the group defined itself. This specific stipulation was unique to *Martinez.*

The majority reiterated that "[f]actual stipulations are binding and conclusive . . . . So, the parties will not be permitted to . . . suggest, on appeal, that the facts were other than as stipulated." *Id.* at 677 (cleaned up). The majority therefore focused solely on the novel "all-comers" policy, refusing to examine the constitutionality of an

8

enumerated nondiscrimination policy as applied to a religious student group. *Id.* at 678; *see id.* at 704 (Kennedy, J., concurring) (noting stipulation).

**C. Under *Martinez*, a facially viewpoint neutral policy may still be viewpoint discriminatory if it is selectively enforced or is a façade or pretext for viewpoint discrimination.**

As *Martinez* demonstrates, the mere fact that a policy applies to all student groups does not mean the policy is constitutional. A policy governing a student organization forum must still be closely examined for whether it is constitutional on its face or as applied to its specific facts. And the "as applied" analysis focuses on whether the policy has been selectively enforced and whether the policy, as adopted or as applied, is pretext for suppressing the speech of a specific individual or viewpoint. Indeed, the majority's final action in *Martinez* was to order a remand to the courts below "to address an argument that deserved their attention," but that the lower courts had failed to address, *i.e.*, whether the all-comers policy was selectively enforced or was pretextual. *Id.* at 697 n.10.

9

As Justice Kennedy stressed, "the case likely would have a different outcome" if the all-comers policy's "evident purpose" was to discriminate based on content. *Id.* at 703-704 (Kennedy, J., concurring). Nor could "an otherwise qualified and relevant speaker . . . be excluded because of hostility to his or her views or beliefs." *Id.* at 703 (citing *Healy v. James*, 408 U.S. 169, 187-88 (1972)). But "*given the stipulation of the parties*, there is no basis for an allegation that the design or purpose of the rule was, by subterfuge, to discriminate based on viewpoint." *Id.* at 704 (emphasis added).

Justice Kennedy advanced three additional circumstances in which a student group "would have a substantial case on the merits if it were shown." *Id.* at 706. First, if "a school has adopted or enforced its policy with the intent or purpose of discriminating or disadvantaging a group on account of its views." *Id.* Second, if an "all-comers policy was either designed or used to infiltrate the group or challenge its leadership in order to stifle its views." *Id.* Third, if "the purpose or effect of the policy was to stifle speech or make it ineffective, that, too, would present a case different from the one before us." *Id.*

10

The requirement that an all-comers policy not be selectively enforced makes authentic all-comers policies rare. Some universities have claimed to have an all-comers policy or even have adopted policies that read like the policy at issue in *Martinez*. But universities typically withdraw their claim when reminded that an all-comers policy must be applied uniformly to all student groups, including fraternities and sororities, a cappella groups, and club sports teams.

The law school in *Martinez* had a relatively easy time making the claim that it applied its unwritten all-comers policy uniformly because its student organization forum had a relatively small number of student groups (approximately sixty) and no social fraternities and sororities. *Id.* at 692 n.22. By contrast, most public universities recognize social fraternities and sororities that exclude leaders and members based on sex. *See, e.g.,* "University of Buffalo Student Guide: Fraternities and Sororities," https://www.buffalo.edu/studentlife/life-on-campus/clubs-and-activities/search/fraternity-and-sorority-life.html (listing twenty recognized fraternities and sororities) (last visited Mar. 17, 2025).

If a university allows fraternities and sororities to choose their leaders and members based on sex, it does not have an all-comers policy

11

by definition. Fraternities and sororities epitomize sex discrimination because they consist solely of male or female members and leaders. And with its highly subjective "rush" method for selecting members, the Greek system is the antithesis of an all-comers policy. An all-comers policy, uniformly applied, is incompatible with the Greek system and many other student organizations.[3]

Many commentators recognized the limits of the *Martinez* decision when it was announced.[4] A leading higher education periodical reported that "a prominent adviser to colleges on issues related to legal risk" cautioned university counsel that they "should not be lulled into

---

[3] Some university officials mistakenly believe that Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681(a)(6)(A), allows them to exempt fraternities and sororities from the university's all-comers or enumerated nondiscrimination policy. But Title IX provides an exemption only from Title IX itself. It does not give a blanket exemption from state or local nondiscrimination laws, including a university's nondiscrimination or all-comers policy.

[4] Leading constitutional scholars have criticized the *Martinez* decision as failing to apply longstanding precedent correctly for many of the reasons identified in the dissent. *Martinez*, 561 U.S. at 706-741 (Alito, J., dissenting, joined by C.J. Roberts and JJ. Scalia and Thomas). *See, e.g.,* Michael McConnell, *Freedom of Association: Campus Religious Groups*, 97 Wash. U. L. Rev. 1641 (2020); John Inazu, *Justice Ginsburg and Religious Liberty*, 63 Hastings L.J. 1213 (2012); Michael Stokes Paulsen, *Disaster: The Worst Religious Freedom Case in Fifty Years*, 24 Regent U. L. Rev. 283 (2012).

thinking their policies on student groups are immune to legal challenges based on the U.S. Supreme Court's decision." Peter Schmidt, *Ruling is Unlikely to End Litigation over Policies on Student Groups*, Chron. Higher Educ. (June 30, 2010), http://chronicle.com/article/Many-Colleges-Student-Group/66101/. Subsequent decisions by federal appellate courts have borne out this counsel.

**D. Correctly assessing the limits of the *Martinez* decision, several federal courts of appeals have protected student organizations' First Amendment rights.**

**1. The Ninth Circuit, sitting en banc, acknowledged *Martinez*'s limited scope in finding that education officials had unconstitutionally denied recognition to a religious student organization because of its religious leadership requirements.**

In a 9-2 decision, the Ninth Circuit found *Martinez* inapplicable in a case in which a school district revoked a religious student organization's recognition and excluded it from the student organization forum because it required its leaders to agree with its religious beliefs. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc) ("*FCA*"). "In response to the ongoing litigation, the District adopted a new version of its non-discrimination policy," an all-comers policy. *Id.* at 678. "In order to gain

13

or retain ASB approval, the student club officers had to sign a statement affirming the club would: 'allow any currently enrolled student at the school to participate in, become a member of, and seek or hold leadership positions in the organization, regardless of his or her status or beliefs.'" *Id.* The district issued guidelines declaring that the "All-Comers Policy was to 'be implemented and construed in accordance with the all comers policy considered by the Supreme Court in . . . *Martinez.*" *Id.*

Relying heavily on *Martinez*, the district court "[a]ppl[ied] a limited public forum analysis as set forth in *Martinez* . . . conclud[ing] that Plaintiffs were unlikely to prevail on their free speech and expressive association claims because the All-Comers Policy was content- and viewpoint-neutral under existing Ninth Circuit law." *Id.* at 679 (discussing *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 2022 WL 1786574 (N.D. Cal. 2022)).

### a. *Martinez* did not render the school district's all-comers policy constitutional.

The Ninth Circuit explained that "*Martinez* does not stand for the broad proposition that an all-comers policy immunizes an institution from scrutiny." *FCA*, 82 F.4th at 694. "Rather, *Martinez* simply held

that a truly categorical all-comers policy—one which required student groups to accept all members without exception—may comply with the First Amendment as a neutral law of general applicability." *Id.* (citing *Martinez*, 561 U.S. at 674-76 (discussing parties' stipulation)).

As to the facts, the Ninth Circuit observed "[t]he narrowness of the Court's holding is evident by its repeated emphasis that the policy was applicable 'across-the-board' on the basis of a stipulated record." *FCA*, 82 F.4th at 686. *Martinez*'s "stipulated facts . . . provid[ed] for an *exceptionless* policy[,]" which was "critically distinct from the discretion the District retain[ed] when applying [its] non-discrimination policies." *Id.* (original emphasis).

As to the law, the Ninth Circuit found *Martinez* inapplicable on several grounds. First, the school district's guidelines carved out several exceptions to the all-comers policy. *Id.* at 687. Next, "[d]espite the All-Comers Policy, schools in the District were allowed to maintain—or even themselves sponsor—clubs with facially discriminatory membership requirements." *Id.* at 678. The court mentioned several examples of this selective enforcement of the all-comers policy. *Id.* at 678, 688-90, 693 (identifying groups formed around ethnicity, sex, and

15

political beliefs). Lastly, the Ninth Circuit rejected *Martinez*'s free exercise analysis that had consisted of a footnote "simply repeat[ing] the holding from *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-82 (1990)." *Id.* at 685.

Instead, the en banc court applied *Smith* by relying on "more recent Supreme Court authority refining what it means to be 'generally applicable' under *Smith.*" *Id.* The Ninth Circuit rested its free exercise analysis on three distinct threads of the Supreme Court's free exercise jurisprudence.

*First*, in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), the Supreme Court had "clarified *Smith*'s scope, holding that the mere existence of government discretion is enough to render a policy not generally applicable." *FCA*, 82 F.4th at 685. The district's all-comers policy permitted government discretion and, therefore, was unconstitutional.

*Second*, both *Fulton* and *Tandon v. Newsom*, 593 U.S. 61 (2021), "clarify that targeting is not required for a government policy to violate the Free Exercise Clause. Instead, favoring comparable secular activity is sufficient." *FCA*, 82 F.4th at 686. Because the school district treated

16

some secular student organizations more favorably than FCA, the district acted unconstitutionally. *Id.* at 688-90, 693.

*Third*, in *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617 (2018), the Supreme Court said, "the government may not act in a manner hostile to religious beliefs." *FCA*, 82 F.4th at 686 (cleaned up). The Ninth Circuit found that "the District's hostility toward FCA was neither subtle nor covert." *Id.* at 690.

Like the Student Association here, the school district made it a condition of recognition that student club officers "sign a statement affirming the club would" comply with the all-comers policy. *Id.* at 678. The FCA officers refused to sign because they could not do so in good faith. The school district then used the student leaders' refusal to sign the form as its rationale for denying FCA recognition because all other student groups had signed the form.

The Ninth Circuit condemned the school district's requirement that a student organization sign the Affirmation Form as a condition for recognition. The court concluded that "the only reasonable inference that can be drawn here is that the 'in name only' All-Comers Policy was adopted in response to the litigation in this case. But the adoption of

17

that policy cannot undo the past animosity toward FCA based on its beliefs." *Id.* at 693. Likewise, here, the Student Association wields YAF's conscientious refusal to sign its form as a "post-hoc justification that is incompatible with the protections of the First Amendment." *Id.*

### b. The en banc Ninth Circuit overruled a 2011 decision that had expanded *Martinez*'s applicability.

In *FCA,* the Ninth Circuit overruled the leading federal appellate decision that had extended *Martinez* beyond its narrow limits. In 2011, while acknowledging that the Supreme Court had refused to decide the issue, a Ninth Circuit panel extended *Martinez* to encompass enumerated nondiscrimination policies. *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 795 (9th Cir. 2011).

In *FCA,* the Ninth Circuit overruled *Alpha Delta Chi*'s free exercise and free speech holdings, explaining that Supreme Court precedent had changed since *Martinez* was decided. 82 F.4th at 685-86 & n.8. The court held that its 2011 ruling was incompatible with the Supreme Court's 2015 decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), which held that a law need not target speech to be unconstitutional content discrimination. The *FCA* court further held

18

*Alpha Delta Chi* was irreconcilable with the free exercise holdings in *Fulton, Tandon*, and *Masterpiece Cakeshop*. 82 F.4th at 686.

### 2. The Eighth Circuit denied qualified immunity to university officials who revoked student organizations' recognition.

In two 2021 cases, the Eighth Circuit protected religious student groups' right to require their leaders to agree with the groups' religious beliefs. *Business Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969 (8th Cir. 2021) ("*BLinC*"); *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855 (8th Cir. 2021) ("InterVarsity"). Both cases arose when the University of Iowa reinterpreted its nondiscrimination policy to deny recognition to religious student groups with religious leadership requirements.

In *BLinC*, the district court held that university administrators violated a student organization's rights to free speech, expressive association, and free exercise of religion by denying recognition because it required its leaders to agree with its religious beliefs. *BLinC v. Univ. of Iowa*, 360 F. Supp.3d 885, 903 (S.D. Iowa 2019). The court concluded that "*Martinez* does not resolve the viewpoint-neutrality question here" because "the University does not have an all-comers policy." *Id.* at 898.

19

Recognizing that *Martinez* had ruled against the free exercise claim, the district court nonetheless found that the university had violated the student group's free exercise rights because it had selectively enforced its policy, a possibility left open in *Martinez*. *Id.* at 902 n.12, 899-903. The district court then granted qualified immunity to the individual defendants, concluding that the law was not clearly established when they had revoked the student organization's recognition. *Id.* at 909.

The Eighth Circuit reversed the grant of qualified immunity as to the student organization's free speech and expressive association claims but affirmed the grant of qualified immunity as to the free exercise claim. *BLinC*, 991 F.3d at 972. The court agreed that the university did not have an all-comers policy. *Id.* at 973. Relying on *Martinez*, *Healy*, *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819 (1995), and *Widmar v. Vincent*, 454 U.S. 263 (1981), the court ruled the law was "clearly established that a university may not discriminate on the basis of viewpoint in a limited public forum[,]" such as a "University's recognition of RSOs." *Id.* at 685. The court emphasized that "*Martinez* does not detract from the clearly established law that a school is prohibited from select[ively] enforcing its nondiscrimination

20

policy against a student group." *Id.* at 986 n.11 (citing *Martinez*, 561 U.S. at 697-98).

During the *BLinC* litigation, the university revoked the recognition of another religious student organization because it required its leaders to agree with its religious beliefs. The district court found the group's free speech, expressive association, and free exercise rights were violated and denied qualified immunity to several administrators. *InterVarsity v. Univ. of Iowa*, 408 F. Supp.3d 960, 978-85, 991-994 (S.D. Iowa 2019).

The Eighth Circuit affirmed, agreeing that "the University's Human Rights Policy was reasonable and viewpoint neutral, but not as applied to InterVarsity." *InterVarsity*, 5 F.4th at 864. The court utilized *Martinez* in holding that the university's actions did not survive strict scrutiny. *Id.* at 865. While the university may have had a "compelling interest in preventing discrimination[,]" it could not "serve[] that compelling interest by picking and choosing what kind of discrimination was okay." *Id.* The administrators lost qualified immunity. *Id.* at 867.

21

### 3. The Seventh Circuit recognized *Martinez*'s limited scope in the context of access to student activity fees.

A student organization sued the University of Wisconsin after it was denied student activity fee funding for activities that included three categories of speech the University refused to fund: "worship, proselytizing, and religious instruction." *Badger Cath., Inc. v. Walsh*, 620 F.3d 775, 777 (7th Cir. 2010). The court had waited "to see whether the Court [in *Martinez*] would modify the approach articulated in *Widmar*, *Rosenberger*, and *Southworth*." *Id.* at 781. But *Martinez* "left that approach in place and reiterated the norm that universities must make their recognition and funding decisions without regard to the speaker's viewpoint." *Id.* While "[t]he Justices divided on the question whether [the law school] had satisfied the neutrality requirement, . . . no Justice disagreed with the propositions that '[a]ny access barrier must be reasonable and viewpoint neutral' and that 'singl[ing] out religious organizations for disadvantageous treatment' is permissible only if the requirements of 'strict scrutiny' can be satisfied." *Id.* (quoting *Martinez*, 561 US. at 679, 684). The court held that the student organization was entitled to funding.

22

II.   **Because of its Unique Factual Context, *Martinez* Does Not Support Application of the Student Association's National Affiliation Ban, Legal Status Ban, or Acknowledgment Form to YAF.**

   **A. The facts of this case differ significantly from *Martinez*.**

A critical fact for the courts of appeals has been that *Martinez* rested entirely on the *parties' stipulation* that the contested all-comers policy was viewpoint neutral. *See FCA*, 82 F.4th at 694 ("The narrowness of the [*Martinez*] holding is evident by its repeated emphasis that the policy was applicable 'across-the-board' on the basis of a stipulated record."). *Southworth* also rested on the parties' stipulation that two of three student activity fee funding mechanisms were viewpoint neutral. The third mechanism, the referendum, was not subject to the stipulation and was presumed not viewpoint neutral. *Southworth*, 529 U.S. at 224-25, 234-35.

The parties here have not entered into any stipulations that would pre-empt a close examination of the policies at issue. Like the universities in *Rosenberger* and *Southworth,* the University at Buffalo imposes a mandatory student activity fee to fund "wide-ranging speech and inquiry" as part of its educational mission. *See Rosenberger*, 515

23

U.S. at 840 ("[A] student activity fee . . . reflect[s] the reality. . . that student expression is an integral part of the University's educational mission."); *Southworth*, 529 U.S. at 221 ("The University contends that its mandatory student activity fee and the speech which it supports are appropriate to further its educational mission.").

But the price for being allowed to compel students to pay a student activity fee is that the University and its Student Association must ensure "the rule of viewpoint neutrality is respected." *Southworth*, 529 at 234. "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access . . . does not depend upon majoritarian consent." *Id.* at 235; *accord Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 100 (2d Cir. 2007).

A vital purpose of activity fee funding is to bring speakers to campus so students may choose, if they wish, to be exposed to diverse perspectives on current issues. In March 2023, YAF brought to campus a nationally known commentator who spoke on a controversial subject in the national conversation. YAF followed the Student Association's process for accessing funding for its event and alleges facts suggesting

24

that the Student Association slow-walked the process, leaving funding uncertain until three days before the event.

Two weeks later, in response to students who disliked the speaker's views, the Student Association amended its "New Club Recognition Policy" to prohibit some—but not all—student organizations from being a "chapter of or otherwise part of any outside organization," which YAF terms the "National Affiliation Ban." JA 191. Any group (apart from a significant number of exempted groups) not complying by May 17, 2023, was "automatic[ally] derecogni[zed]." *Id.* (later extended to May 31). When the proposal was introduced, the Student Association president admitted, "We all know why we're doing this." JA 151.

On June 1, 2023, YAF filed suit challenging the Ban and, on June 26, moved for preliminary injunctive relief. On July 3, the Student Association adopted a "Resolution to Repeal and Replace" that repealed the Ban and "deemed [it] never to have taken effect," despite its "automatic derecogni[tion]" proviso.

The Resolution replaced the Ban with a requirement that any student officer of a recognized student organization must sign an

"Acknowledgment of Club Officer Responsibilities" ("Acknowledgment Form") "prior to taking any act as a SA club officer—including but not limited to the use of SA club funds, facilities, or other resources." JA 202. In signing the Acknowledgment Form, a student officer "certif[ies] that [he or she] will not violate any of the SUNY, UB, or SA policies or rules applicable to SA clubs." JA 204. The Resolution refers to "SA clubs [that are] a chapter of or otherwise a part of an outside organization" and to the Student Association's "attempt[] to address SA club compliance with SUNY's, UB's, and SA's rules or policies" in the Ban. JA 201-202. The Resolution notes its Ban received "student feedback" that made the Student Association "consider[] whether a new, superseding policy could better address the SA Senate's concerns underlying its adoption of" the Ban. JA 202. In the Resolution's own words, the Acknowledgment Form requirement is an "attempt to address an underlying concern reflected in the [National Affiliation Ban] but in a different manner." *Id*.

Among the many Student Association policies triggered by signing the Acknowledgment Form is SA Bylaw §7.04(d), which YAF terms the "Legal Status Ban." The bylaw prohibits a recognized student

26

organization from "be[ing] a separate legal entity from SA," and from "enter[ing] into contracts, tak[ing] legal action, [or] commenc[ing] litigation." "[O]nly SA itself may" do so. JA 228-229.[5] Language used in the bylaw appears in the Resolution. JA 228. YAF's officers have been unable to sign the Acknowledgment Form because of the conflict between the bylaw's prohibition on student organizations taking legal actions and this lawsuit. JA 424-508.

## B. The policies at issue here differ significantly from the *Martinez* policy.

In his *Martinez* concurrence, Justice Kennedy advanced several scenarios in which a student group "would have a substantial case on the merits." 561 U.S. at 706 (Kennedy, J., concurring). The Student Association's actions epitomize those distinguishing scenarios. To start, "an otherwise qualified and relevant speaker may not be excluded because of hostility to his or her views or beliefs." *Id.* at 703. Hostility to YAF's speech pervades the Student Association's adoption of the

---

[5] Bylaw §7.04(d) states in part: "No club shall be a separate legal entity from SA. . . . Recognized clubs may not enter into contracts, take legal actions, commence litigation or undertake legal obligations; only SA itself may enter into contracts, take legal actions, commence litigation and/or undertake legal obligations." JA 228-229.

National Affiliation Ban and the Acknowledgment Form requirement. Second, the Student Association "has adopted or enforced its policy with the intent or purpose of discriminating or disadvantaging a group on account of its views." *Id.* at 706. Again, the National Affiliation Ban and Acknowledgment Form were adopted and enforced with the purpose of disadvantaging YAF because of its views. Third, the Ban and the Form were "designed . . . [to] challenge [YAF's] leadership in order to stifle its views." *Id.* Knowing that the Ban's and Form's adoptions targeted their organization, YAF leaders must think carefully ("chilled" is the First Amendment term of art) when deciding whether to "certify that [he or she] will not violate *any of the SUNY, UB, or SA policies or rules applicable to SA clubs*." JA 204 (emphasis added). Fourth, if "the purpose or effect of the policy was to stifle speech or make it ineffective, that, too, would present a case different from" *Martinez*. 561 U.S. at 706 (Kennedy, J., concurring). The Student Association's whole purpose in the Ban and Form has been "to stifle [YAF's] speech or make it ineffective," a purpose that, so far, the Student Association has achieved.

28

Finally, Justice Kennedy and the majority believed that the likelihood of a "hostile takeover" of a student organization was not realistic on the *Martinez* facts. *Id.* at 692-93. But that seems precisely the impact of the Acknowledgment Form and Legal Status Ban on YAF. Against YAF's will, the Legal Status Ban obliterates YAF as a "separate legal entity" and deprives it of the legal means to defend itself. That Bylaw 7.04(d) existed prior to the Acknowledgment Form's requirement is irrelevant. That other student organizations are either oblivious or apathetic to the Ban is irrelevant. YAF is not oblivious or apathetic regarding its legal status.

The policies at issue plainly are not an all-comers policy. But recall that even a policy labeled "all-comers," with very similar language to the *Martinez* all-comers policy and to "be implemented and construed in accordance with the all-comers policy considered by the Supreme Court in . . . *Martinez*," did not pass muster with the Ninth Circuit. *FCA*, 82 F.4th at 678, 693-94.

The *Martinez* all-comers policy applied to all student groups, which the National Affiliation Ban expressly did not. JA 191. A policy with numerous exemptions is the antithesis of the "exceptionless"

*Martinez* policy. *FCA*, 82 F.4th at 686. The Acknowledgment Form and Legal Status Ban fail the viewpoint neutrality requirement and, therefore, are not like the *Martinez* policy.

## III. In Their Treatment of YAF, the University and Student Association Have Failed to Obey "the Rule of Viewpoint Neutrality."

*Southworth* requires that "the rule of viewpoint neutrality [be] respected" by a university and its student government when administering a student organization forum. 529 U.S. at 234. In *Amidon*, this Court addressed the constitutionality of a student association's method for "allocat[ing] funds from a mandatory student activity fee among student organizations." 508 F.3d at 95. In such a forum, "[t]he denial of funding in a viewpoint-discriminatory manner is as impermissible as the denial of access to a physical forum in a viewpoint-discriminatory manner." *Id.* at 100. This Court explained that "[t]here may be restrictions on speech in a limited public forum so long as they are viewpoint-neutral and reasonable in light of the forum's purpose and do not serve as a façade for viewpoint discrimination." *Id.* (citations omitted).

30

As discussed below, the Student Association's policies here are actually more problematic than the SUNY-Albany Student Association's referendum that this Court found unconstitutional in *Amidon* and, therefore, should likewise be held unconstitutional.

### A. The Student Association's control over YAF's ability to take legal action prevents effective judicial review, which is a vital protection against viewpoint discrimination and unbridled discretion.

This Court has been alert to any "practice" that "injects a substantial risk of undetectable viewpoint discrimination into the allocation process." *Amidon*, 508 F.3d at 103. Viewpoint neutrality and the correlated prohibition on unbridled discretion requires that a student association's policies regarding recognized student organizations must be "subject to effective judicial review." *Id.* That is, "[i]n order to make decisions granting or denying permits *subject to effective judicial review*, there must be 'adequate standards to guide the official's decision.'" *Id.* (quoting *Field Day, LLC. v. Cnty. of Suffolk*, 463 F.3d 167, 176 (2d Cir. 2006) (quoting *Thomas v. Chicago Park Dist.*. 534 U.S. 316, 323 (2002))) (emphasis added).

31

At issue in *Amidon* was the constitutionality of a student referendum asking "whether all students should pay a certain dollar amount" to a specific RSO. *Id.* at 96. The Supreme Court has ruled that "[f]unds from a mandatory student activity fee to support student speech must be allocated in a viewpoint-neutral way." *Id.* at 99 (citing *Southworth*, 529 U.S. at 229-30, 233-34). The SUNY-Albany Student Association distinguished its "advisory" referendum from *Southworth*'s "binding" referendum. *Id.* at 100. But this Court rejected that distinction. The problem was the need for "effective judicial review." *Id.* at 103. The fact that the "funding process [was] only advisory" exacerbated the judicial review problem because the "courts cannot tell the degree to which the referendum infected the SA's decision." *Id.* Specifically, "there [were] no effective safeguards to prevent a discriminatory advisory referendum from tainting the allocation process." *Id.* at 103-104.

The Student Association's Legal Status Ban eviscerates viewpoint neutrality's indispensable safeguard—effective judicial review. The Student Association is the ultimate decisionmaker as to whether a court will review its actions for viewpoint neutrality.

32

The Supreme Court's premise underlying *Rosenberger*, *Southworth*, and *Martinez* is that recognized student organizations are *entities distinct from* the universities and the student governments that administer the student activity fee forum. *See Rosenberger*, 515 U.S. at 835 (student groups "are not the University's agents, are not subject to its control, and are not its responsibility").

But the Legal Status Ban turns that understanding on its head. All a university or student government need do to circumvent the viewpoint neutrality required by *Southworth*, *Rosenberger*, *Martinez*, *Widmar*, and *Healy* is to do what the University and Student Association claim to do here: strip all recognized student organizations of their "separate legal entity," including the right to "take legal actions [and] commence litigation" apart from the Student Association.[6]

---

[6] It is no response to assert that individual students can sue to vindicate the organization's First Amendment rights. In litigation involving access to a student organization forum, individual student plaintiffs often cannot maintain standing for purposes of prospective relief for the duration of often lengthy litigation, as this case itself shows. Appellants' Br. 1 n.1. To avoid potential mootness, the student organization itself needs to be a party.

33

If a student government can compel all recognized student groups to forfeit their separate legal status, including their right to commence litigation and take legal actions, there is no mechanism by which student organizations can enforce the viewpoint neutrality that the Supreme Court has held is essential to the constitutional administration of a student activity fee forum. Student organizations' ability to challenge in court a student government's allocation of mandatory student activity fees is essential to ensuring that "the rule of viewpoint neutrality is respected." *Southworth*, 529 U.S. at 221.

## B. The Student Association violated viewpoint neutrality by imposing its majoritarian determination on YAF.

Addressing the constitutionality of a referendum "to fund or defund an RSO," this Court repeated that "*[t]o the extent the referendum substitutes majority determinations for viewpoint neutrality it would undermine the constitutional protection the program requires*." *Amidon*, 508 F.3d at 100 (quoting *Southworth*, 529 U.S. at 235 (original emphasis). This Court reiterated the Supreme Court's explanation that "[t]he whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Id.* Essentially, the "controlling" principle of viewpoint neutrality in a university's or

34

student government's treatment of student organizations must be that "[a]ccess to a public forum . . . does not depend upon majoritarian consent." *Id.*

To summarize the facts here suffices. The Student Association adopted the National Affiliation Ban two weeks after YAF hosted a speaker event that many students opposed. As the Student Association President admitted, "We all know why we're doing this." But "student feedback" made clear that uniform application of the Ban was unacceptable to constituent student groups. The Student Association therefore replaced it with the Acknowledgment Form requirement in an "attempt to address an underlying concern reflected in the [National Affiliation Ban]." JA 202; *supra*, pp. 24-27.

The Student Association's sustained effort to impose the majority's views on an unpopular group does not respect the rule of viewpoint neutrality. And a student association's bylaw or university's policy "general requirement that funding decisions be viewpoint-neutral is insufficient to salvage the process." *Amidon*, 508 F.3d at 104 ("[T]he bare statement without meaningful protections is inadequate to honor [Southworth's] commands.").

35

### C. Post-hoc justifications violate viewpoint neutrality.

The Acknowledgment Form represents a stratagem from the 1950s era of loyalty oaths. The Student Association requires student leaders to sign a form that seemingly is not problematic for other groups but is problematic for a targeted group like YAF. If the YAF leaders sign the form, they either sign away YAF's rights, or attest to something untrue, or both. And they put themselves at risk of disciplinary action by the University for signing something that is not true. But unless they sign, their organization loses significant benefits.

In *FCA*, the en banc Ninth Circuit refused to condone this tactic. There the school district had imposed as a condition of recognition that "student club officers had to sign a statement affirming the club would" comply with the purported all-comers policy. 82 F.4th at 678. The FCA officers refused to sign because they could not do so in good faith. The school district then wielded the student leaders' refusal to sign as its reason for denying their group recognition. *Id.* at 693.

The Ninth Circuit condemned the school district's gambit because "the only reasonable inference that can be drawn here is that the 'in name only' All-Comers Policy was adopted in response to the litigation

in this case. But the adoption of that policy cannot undo the past animosity toward FCA based on its beliefs." *Id.* Similarly, the Student Association here uses YAF's conscientious refusal to sign the Acknowledgment Form as a post-hoc justification for its viewpoint discriminatory denial of benefits to YAF. The Acknowledgment Form requirement unquestionably was "'invented *post-hoc* in response to litigation.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). "Government 'justifications' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" *Id.* Both the National Affiliation Ban and Acknowledgment Form are "the type of post hoc justification that is incompatible with the protections of the First Amendment." *FCA*, 82 F.4th at 693.

37

## CONCLUSION

For the reasons set forth above and in the Principal Brief of Plaintiffs-Appellants, this Court should reverse the district court decision and remand with instructions to enter Plaintiffs-Appellants' requested injunction.

Respectfully submitted,

/s/ Kimberlee W. Colby
Kimberlee W. Colby
   *Counsel of Record*
Christian Legal Society
Center for Law & Religious Freedom
8001 Braddock Road, Suite 302
Springfield, VA 22151
(703) 919-8556
kcolby@clsnet.org

March 18, 2025               *Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) and L.R. 29.1(c) and 32.1(a)(4), because it contains 6,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Kimberlee W. Colby
Kimberlee W. Colby

Date: March 18, 2025

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 18, 2025, she electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system

/s/ Kimberlee W. Colby
Kimberlee W. Colby
